| 3 | 333 |
|---|---|
| 97 | 113 |
| 3 | 333 |
| 125 | 624 |

</div>

No. 49.—NEEDHAM MIMS, plaintiff in error, *vs.* THE MACON & WESTERN RAIL ROAD COMPANY, defendant in error.

[1.] Some general principles asserted, respecting the rights and remedies of land holders and stockholders, citizens and corporations, in reference to internal improvements.

[2.] The lien of the vendor of real estate, attaches for the purchase money against the vendee, and all persons claiming as *volunteers* or *with notice*, under him.

[3.] The vendor's lien applies to lands, the title to which has been transferred by operation of law, under our rail road and other corporation charters, as well as to voluntary sales, by the party himself.

[4.] There is no fixed rule as to what amounts to a waiver; each case must be determined by its own circumstances.

[5.] Even the taking of security for the purchase money, is not conclusive evidence that the lien is waived.

[6.] The vendor's lien is not extinguished by the acceptance of the certificate of deposit of the cashier of the corporation, for the valuation of his land as assessed by the commissioners; provided the money is not paid when called for, owing to the insolvency of the company.

[7.] A decree in equity, for the sale of the land, is the proper remedy to enforce the lien.

In Equity. Bill to enforce vendor's lien. Tried before Judge FLOYD. In Bibb Superior Court. May Term, 1847.

The facts and circumstances of the case, and the error assigned, are fully stated in the opinion delivered by the Supreme Court, to which the reader is referred.

His Honour, Judge NISBET, having been of counsel below, gave no opinion.

JOHN J. GRESHAM, for the plaintiff in error.

A vendor of real estate has a lien upon it for the unpaid pur-

chase money, unless the circumstances of the case show an intention not to reserve the lien, or unless separate and independent security be taken.

Taking the bond or note of the purchaser does not waive the lien. *Mackreth* vs. *Symmons*, 15 *Vesey R.* 330; *Nairn* vs. *Prowse*, 6 *id.* 752; *Stafford* vs. *Van Rensselaer*, 9 *Cowen R.* 316; *Garson* vs. *Green*, 1 *Johns. Ch. R.* 308; *Hughes* vs. *Kearney*, 1 *Sch. & Lefr. R.* 132; *Gibbons* vs. *Baddall*, 2 *Eq. Cas. abr.* 682; *Coppin* vs. *Coppin*, 2 *P. Wilms. R.* 291; *Brown* vs. *Gilman*, 4 *Wheat. R.* 255; *Deible* vs. *Barwick*, 1 *Blackf. R.* 339; *Cole* vs. *Scott*, 2 *Wash. R.* 141; *Story Eq.* 462 *to* 482; *ib.* 544 *to* 549.

McDonald, and Poe & Nisbet, for the defendant in error.

Private property not to be taken for public use without just compensation. *Prince* 900.

In this case the money was tendered to the complainant, and he refused to accept it.

That the tender was sufficient, see *Norris' Peake* 431, 422; 8 *Johns. R.* 474.

The acceptance of the certificate of deposit was payment under the circumstances of this case.

But if it was not, the tender previously made and the refusal, vested the property in the defendant, and the defendant had a right to convey. *Prince* 316.

The defendant having a right to convey, the sale, under the decree of the court of chancery, vested the same title in the purchaser that he would have received had he taken the conveyance direct from the Monroe Rail Road Company. .

By the refusal of the money when tendered, Mims lost his lien on the land, and only held a demand against the Monroe Rail Road and Banking Company, for the amount of the assessment, and was reduced to a footing with the general creditors of the company. 18 *Johns. R.* 110.

*By the Court.*—Lumpkin, J., delivering the opinion.

In 1833, the legislature of Georgia incorporated the Monroe Rail Road Company, with the following clause in their charter, section 10 :

" In all or any case or cases, where land or private rights of way

Mims *vs.* Macon & Western R. R, Co.

may be required by said company, for the uses aforesaid," [meaning the construction of the road,] " and the same cannot, for want of agreement between the parties as to price, or for any other cause, be purchased from the owner or owners thereof, the same may be taken at a valuation, to be made by commissioners or a majority of them, to be appointed by the Superior court of the county where the land or right of way may be situated; and the said commissioners, before they act, shall severally take an oath before some justice of the peace, faithfully and impartially to discharge the duties assigned them. In making said valuation, the said commissioners shall take into consideration the loss or damage which may occur to the owner or owners, in consequence of the land being taken or the right of way obstructed, and also the benefit and advantage that he, she or they may receive from the establishment of said rail road, and shall state particularly the nature and amount of each; and the excess of loss or damage, over and above the benefit and advantage, shall form the measure of valuation of said land or right of way. The proceedings of said commissioners, accompanied with a full description and plat of said land, shall be returned under the hands and seals of said commissioners, or a majority of them, to the court whence said commission issued, there to remain on record; and the lands or right of way, shall vest in said company in fee simple, as soon as the valuation thereof may be paid, or, when refused, may be tendered." *Prince* 316. Meaning of course, when *tendered* may be *refused.*

By an amendment to the charter, passed in December, 1835, and accepted by the company, it is provided, section 2: " In all cases where by the 10th section of the original act, a valuation may have been made, or shall hereafter be made, of land through which the rail-road passes, by the commissioners, that either party may have, the right of appeal to a special jury, at the ensuing term of the Superior court: *Provided,* that the progress of said road shall not be arrested by said appeal; and provided further, that said company shall give security to the party, for the payment of all damages that may be assessed by the special jury." *Prince* 345, 346. All of our rail road charters contain a provision similar to this; and it is inserted here to show the oft declared opinion of the legislature, that the 8th amendment to the constitution of the United States, which declares that, " in suits at common law, where the value in controversy shall exceed twenty dollars, *the right of*

*trial by jury shall be preserved*," applies to the States and the State courts, as well as to Congress and the National courts.

In 1836, the Monroe rail road company, having entered upon the work of constructing their road, and not being able to agree with Mims, through whose land it passed, as to the right of way, applied to the Superior court of Bibb county to appoint commissioners to value the land of Mims, in terms of their charter. This was done, and the commissioners made two several assessments, one for the sum of $1,482 10, and the other for $175 00; no appeal was entered by either party. The amount of the assessment was tendered to Mims, in gold, by Peter Solomon, the cashier of the company, and refused. The company, on the 15th of February, 1840, placed in the hands of Henry G. Ross, the clerk of the Superior court of Bibb county, an instrument to this effect:

"MONROE RAIL ROAD & BANKING CO., <br>
*Macon, Feb'y.* 15, 1840.

"This is to certify, that H. G. Ross, Esq., clerk of the Superior Court of Bibb County, has deposited in this bank, for the assessment of damages by the commissioners, over the land of Needham Mims, through which the rail road passes, fourteen hundred and eighty-two dollars and ten cents; also, an additional sum of one hundred and seventy-five dollars, for a second assessment; each in current funds, which shall be paid to his order hereon.

(Signed)

JEREMIAH LEAK, *Cashier.*

[Indorsed.] "I indorse this certificate to N. Mims, without recourse.                                    H. G. Ross, *Clerk."*

Ross testified that this certificate was placed in his hands by the cashier of the company; that no money ever came into his hands, nor was any deposited by him in the bank of said company; that the company was in good credit when this certificate was placed in his possession; that he notified Mims that he held this certificate, and that he might get his money; other depositors got theirs; Mims had brought actions of trespass against Timothy Matthews and Robert Redding, the contractors under said company, and failing to recover, he was compelled to receive the certificate of deposit. Ross further stated, that at the time the certificate was turned over to Mims, the company was utterly and notoriously insolvent.

The Monroe Rail Road, with its equipments, was sold under a decree in chancery for the benefit of all concerned, and purchased by the Macon & Western Rail Road Company. It was admitted

that Mims was no party to the bill under which this sale took place. It was in proof, that notice was given on the day and at the place of sale, by the agent of Mims, that he should assert his lien on the land seized by the company, for the amount of the valuation assessed by the commissioners. Moreover, it was in evidence, that before filing his bill he had demanded payment of said amount at the office of the Macon & Western Rail Road Company, which, upon consultation and taking time to consider, they refused to pay.

Mims now filed his bill for the enforcement of his lien, praying that the land which he formerly owned and occupied, and which had been seized and appropriated by the company, might be sold, and the proceeds applied to the payment of the said several sums assessed by the commissioners, with interest thereon.

The cause was submitted to the jury, under the instructions of his honour, Judge Floyd, who charged, " That the act of the legislature incorporating the Monroe Rail Road & Banking Company, which provides for the assessing of the damages for the right of way, created a remedy, and did not take away the common law remedy by trespass or ejectment; that the plaintiff in error had his remedy as at common law, for the damages done to his premises, by the passage of the Monroe Rail Road through them. That the tender of the amount of the assessment made during the pending of the actions of trespass against the contractors on the Monroe Rail Road, did not vest the title to the land of the plaintiff in error, in the Monroe Rail Road Company, under that clause of the constitution of the United States which declares, that ' private property shall not be taken for public use without just compensation;' and that the plaintiff in the actions of trespass ought to have recovered. That the plaintiff in error, if he failed to recover in his actions of trespass, or if he chose to abandon them and trust the assessment of the right of way as a sale, would have a lien on the land which has been taken from him by the Rail Road Company ; but that by receiving the certificate of deposit in this case, he had waived his lien, and could not recover in this proceeding. The Court below then instructed the jury to decree in favour of the defendant, because the complainant had no lien on the land, as against the Monroe Rail Road Company; and the jury decreed accordingly.

To which charge and instruction of the Court below, the plaintiff in error, by his counsel, excepted.

The opinion of the Court upon a solitary point, will dispose of

this case; and that is, whether the acceptance by Mims of the certificate of deposit was a waiver of his equitable lien.

[1.]   Before I proceed to deliver the judgment of the Court upon that question, it may not be amiss to state briefly its views upon some of the other topics involved in this charge.   Our State is perhaps second to none in the Union in her magnificent system of rail roads ; many of them are completed, some are in a process of construction, and others are about to be undertaken.   It is due to landholders no less than stockholders, to citizens as well as to corporations, that there should be no confusion, uncertainty, or misapprehension as to their respective rights and remedies.

We hold, then, that the legislature, upon the fundamental principles of all governments, and in the exercise of the power of the eminent domain of the State, may appropriate *private property*, real or personal, to *public uses*, upon just compensation to the owner.

That it belongs to the legislature, as the immediate and direct representatives of the aggregate body of the people, to determine what objects are or are not of such public importance, as to justify them in thus interfering with the rights of private property. ·

That this right of *eminent domain*, may be exercised either directly by the agents of the government, or through the medium of corporate bodies, or by means of individual enterprise.

That agents, surveyors, engineers, &c., of rail roads, canals, turnpikes and bridges, authorized to be constructed as public works by the legislature, may enter upon the lands of individuals for the purpose of making examinations, so as to determine the most eligible route or location previously to acquiring title to the land, or the assessment and payment of damages, but that just compensation must be made before the fee can vest.

That whenever just compensation is made, or *tendered* and *refused*, and all the *conditions precedent* prescribed by the legislature are performed, the constitution is complied with, and the property required for public use, may be lawfully appropriated; and neither ejectment can be maintained for the premises, nor trespass against those agents, whose duty it is, under the act, to take possession of the land and occupy it for the purposes therein designated.

And further than this we are not willing at present to go.   We are not prepared to admit, that previous to making just compensation, or a tender and refusal, the right can be conferred to

take exclusive possession of the land of another, and use it for the construction of rail ways and other public works, or to hold an act *constitutional*, which authorizes private property to be taken for the public use, although it entirely omitted to provide any mode of making just compensation. Such is our respect for the inviolability of private property, that we must be convinced beyond a reasonable doubt, before we would consent to have it taken for any of the purposes herein contemplated, unless just indemnity be afforded. All civilized nations admit that an individual whose property is thus wrested from him against his will, must be suitably remunerated. *Grotius De. Jur. B. & P., b.* 8, *ch.* 14, *sec.* 7; *Puffendorf De. Jur. Nat. et Gent., b.* 8, *ch.* 5, *sec.* 7; *Bynkershoek, Quæest. Jur. Pub. b.* 2, *ch.* 15.

" The laws of England," says Blackstone, " are therefore, in point of honour and justice, extremely watchful in ascertaining and protecting this right, (right of personal property.) Upon this principle, the great charter has declared, that no freeman shall be disseised or divested of his freehold or of his liberties or free customs, but by the judgment of his peers or by the law of the land."

" So great, moreover," continues the great commentator, " is the regard of the law for private property, that it will not authorize the least violation of it; no, not even for the general good of the whole community. If a new road, for instance, were to be made through the grounds of a private person, it might, perhaps, be extensively beneficial to the public; but the law permits no man or set of men to do this without consent of the owner of the land. In vain may it be urged that the good of the individual ought to yield to that of the community, for it would be dangerous to allow any private man or even any public tribunal, to be the judge of this common good, and to decide whether it be expedient or no. Besides, the public good is in nothing more essentially interested, than in the protection of every individual's private rights, as modelled by the municipal law. In this and similar cases, the legislature alone can and indeed frequently does interpose, and compel the individual to acquiesce. But how does it interpose and compel? *Not by absolutely stripping the subject of his property in an arbitrary manner, but by giving him a full indemnification and equivalent for the injury thereby sustained. The public is now considered as an individual, treating with an individual, for an exchange. All that the legislature does, is to oblige the owner to alienate his possessions*

*for a reasonable price; and even this is an exertion of power which the legislature indulges with caution, and which nothing but the legislature can perform."* 1 *Black. Com.* 139.

I leave it to others to say how far these just and noble sentiments were practically maintained by Lord Kenyon and Mr. Justice Buller, in the case of the Governor and Company of the British Cast Plate Manufactory, against Meredith and others, 4 *Durn. & East R.* 431.

" But what," says Chancellor Kent, in treating of the sacredness of private property, "is of higher authority, and is absolutely decisive of the sense of the people of this country, it is made a part of the constitution of the *United States,* that private property shall not be taken for public use without just compensation. I feel myself therefore, not only authorized, but bound, to conclude that a provision for compensation is an indispensable attendant on the due and constitutional exercise of the power of depriving an individual of his property."

Shall it be said, that this fifth article of the amendments of the constitution of the *United States,* like the other *nine,* relates to the powers of the national government, and was intended as a restraint on that government? Admit it, and still, as we endeavoured to show in *Hawkins H. Nunn* vs. *The State of Georgia,* 1 *Kelly R.* 243, the "all important and essential doctrines" contained in these ten amendments, are in no wise weakened. They are, in the emphatic language of Chief Justice Spencer, in *Bradshaw* vs. *Rodgers,* 20 *Johns. R.* 106, " great and fundamental principles of government; and any law violating them, must be deemed a nullity, as it is against natural right and justice."

If we are right, then, in the principles already laid down, the tender on the part of the company, of the compensation assessed by the commissioners, transferred the right to the use and occupation of the land, from Mims to the company; and they had the power lawfully to enter upon the same for the construction and maintenance of their road and the appurtenances thereto. Indeed, it was a sale effected by operation of law. But, while the tender worked a transfer of the title under the charter, it was no payment of the purchase money. To have operated as an extinguishment of the debt, it was not enough for the company to plead the tender and refusal, with *uncore pret,* but they must likewise plead *tout temps prist;* not only that they once offered to pay, but that they have been at all times from the time of the assessment,

and are still ready to pay. 6 *Bac. Abr.* 464 ; *Salk. R.* 623 ; *Lord Raym. R.* 254.

It has been urged in argument, that Mims is bound by the decree in chancery ordering a sale of this road. Had he stood by, and acquiesced by his silence in this sale, his conduct might have been construed into an assent on his part, at any rate as against a *bona fide* purchaser ; on the contrary, he was no party to the decree, and on the day of sale gave express notice, through his agent, of his intention to assert his lien for the amount of the assessment. The Macon & Western Rail Road Company took the property, therefore, *cum onere.*

Having disentangled the case, then, of every thing foreign to the true issue, we proceed to examine, *first,* what is meant by the vendor's lien ? *Secondly,* whether it attaches on this property ? *Thirdly,* whether it has been waived by Mims ? And if not, whether, in the last place, he has adopted the rightful remedy to enforce it ?

1. As to the *nature* of this lien. The doctrine is, that the [2.] vendor of land has a lien on the land for the amount of the purchase money, not only against the vendee himself and his heirs and other privies in estate, but also against all subsequent purchasers having notice that the purchase money remains unpaid. To the extent of the lien, the vendee becomes a trustee for the vendor and his heirs ; and all other persons claiming under them with such notice, are treated as in the same predicament. This lien of the vendor of real estate for the purchase money, attaches to the estate, whether it be actually conveyed or only contracted to be conveyed. It attaches to the estate as a trust, and is wholly independent of any possession on the part of the vendor. Where the conveyance is made prematurely, *before* money paid, the money is considered as a lien on the estate in the hands of the vendee.

It has been often objected that the creation of such a trust by courts of equity, is a contravention of the policy of the Statute of Frauds. It is not, perhaps, so strong a case as that of a mortgage implied by a deposit of the title deeds of real estate, which seems directly against the policy of the statute, but which nevertheless has been unhesitatingly sustained. But whatever may be the original force of such an objection, the doctrine is now too firmly established to be shaken by any mere theoretical doubts.

The principles upon which courts of equity have proceeded in establishing this lien in the nature of a trust, is, that a person who

has gotten the estate of another, ought not in conscience, as between them, to be allowed to keep it and not to pay the full consideration money. *A third person, having full knowledge that the estate has been so obtained, ought not to be permitted to keep it without making such payment; it attaches to him also as a matter of conscience and duty. It would otherwise happen that the vendee might put another person into a predicament better than his own, with full notice of all the facts. 2 Story Eq. sec. 1217, et seq. & notes.*

[3.] 2. It is unnecessary to add any thing further, as to the origin and extent of this lien; and no reason occurs to us why it should not apply equally to a forced sale under the law, as to a voluntary conveyance by the party himself. Indeed, the reason is stronger for maintaining it in the former case than in the latter. In voluntary sales, the vendor might perhaps be left to suffer the consequences of his own want of caution without just ground of complaint. But this cannot be affirmed, where he is deprived of his property against his will by the strong arm of the law, under the stern plea of State necessity.

[4.] 3. Was the acceptance by Mims of the certificate of deposit, a waiver of his lien? And if so, upon what principle? seeing that the purchase money remains unpaid. There can be no general rule as to what shall be deemed sufficient to repel or displace the lien, or to amount to a waiver of it. Each case must be determined by its own circumstances. Generally speaking, the lien of the vendor exists, and the burden of proof is on the purchaser, to establish, that, in the particular case, it has been displaced or waived by the party. If, under all the circumstances, it remains in doubt, then the lien attaches. *2 Story Eq. sec.* 1224.

By the Roman law, from which this doctrine was imported into the equity jurisprudence of England, the taking of a security for the payment of the purchase money, was a positive waiver of the lien; and such was the tenor of the early adjudications upon this subject. And it has been regretted that a rule so plain should have ever been departed from. Such it seems, however, is not the doctrine as settled, or rather, perhaps, I might say, as *un*settled [5.] by the more modern cases. The taking even of other and distinct security, is now held not as conclusive of the waiver, but at most no more than a presumption of an intentional waiver. 2 *Story Eq. sec.* 1226; *Mackreth* vs. *Symmons,* 15 *Vesey R.* 330, 336, 342; *Saunders* vs. *Leslie,* 1 *Ball & Beatt. R.* 514, 515.

The taking a mortgage on another estate, or of a pledge of other property, or of bills of exchange drawn on and accepted by a third person, or by the purchaser and a third person, have been deemed not to be a waiver of the lien, but to be merely a mode of payment; and it has been laid down as clear doctrine, that in general where a bill, note or bond, is given for the whole or a part of the purchase money, the vendor does not lose his lien for so much of the purchase money as remains unpaid, even though it is secured to be paid at a future day, or not until after the death of the purchaser. 2 *Story Eq. sec.* 1226, *and notes.*

The rule in New York is to sustain the implied lien whenever the vendor has taken the mere personal security of the purchaser only; and to consider any bond, note or covenant, given by the vendee alone, as intended only to countervail the receipt of the purchase money contained in the deed, or to show the time and manner in which the payment is to be made; unless there is an express agreement between the parties to waive the equitable lien, and on the other hand to consider the lien as waived, whenever any security is taken, on the land or otherwise, for the whole or any part of the purchase money, unless there is an express agreement that the equitable lien on the land shall be retained. 1 *Paige R.* 20.

This rule has the advantage of simplicity, being easily understood; and would seem to be supported in the main by the American authorities as well as the English decisions, before the Revolution.

Tested by either of these rules, we do not perceive upon [6.] what principle it can be insisted, that the acceptance by Mims of the certificate of deposit was a waiver of his lien. Is the case any stronger than if he had taken the *note* of the company at the time for the amount of the assessment? Not so much so; for the certificate entitled him only to payment in current bills, whereas, by holding the unconditional obligation of the purchaser, he would have been entitled to have demanded payment in constitutional coin. But suppose that he had taken the note of the company, and sued it to insolvency, could he not then have resorted to equity for the enforcement of his lien? And is the acceptance by him of the certificate of deposit of the cashier of the company—acknowledged to be utterly broken at the time he received it—any more conclusive than the note and judgment would have been? The very foundation for this proceeding is, that the vendor can get his

money in no other way. And yet the inability of the company to pay, is the very excuse assigned for ousting him of his equity.

Had this certificate of deposit been of the coin actually tendered, and it had been squandered by the company, surely it would constitute no bar to this recovery. But it is not even that; for it only obligates the company to pay in *current bills,* and not to account for any specific deposit.

Again, had the company deposited the money in any other bank, or in the hands of any private individual, and it had been lost, we apprehend that this would be no protection when called on for it ; are they better off when they have wasted it themselves ? Had Mims accepted a certificate of deposit elsewhere, and lost the money by his own neglect in failing to draw it within a reasonable time, there would be some propriety in contesting his present claim ; but, unfortunately for the company, such is not the fact. The money tendered to Mims in payment for his land, was returned to their own vaults, and when called for, they confess their inability to respond. Nay, it is not denied but that they were bankrupt at the time when the certificate was received. Shall Mims be punished for the fault of the company ? shall he forfeit the price of his property because they were unable to redeem their pledge ? Would not this land be unconscientiously obtained unless the consideration is paid ?

[7.] 4. It is conceded by the learned counsel for the defendant in error, that, provided his lien exists Mims has adopted the proper remedy for enforcing it. Indeed, we know of none other that is open to him. The title to his land has been vested in the company by operation of law. The corporation having complied strictly with the provisions of its charter, he cannot maintain trespass or ejectment. A suit upon the certificate, it is admitted, would be wholly unavailable, owing to the insolvency of the company. He is consequently wholly remediless, unless *equity will* interpose for his relief, by decreeing a sale of the property for the payment of the purchase money. And we are of the opinion that he is entitled to this relief. Nor will this judgment serve in the least to impede or obstruct the great enterprise, of which, in common with the rest of our fellow-citizens, we feel so deservedly proud. The present proprietors, who bought with notice, and who stand therefore, precisely in the shoes of their predecessors, the Monroe Rail Road and Banking Company, have only to pay to this citizen the price put upon his property by commissioners appointed for that purpose, upon their own application, and all

strife and contention are at an end. Would they consent to hold and enjoy it upon any other terms?

The judgment below must be reversed.